RICHARD T. WHITE #58622
DAWN NEWTON #209002
SARA N. PASQUINELLI #233512
FITZGERALD ABBOTT & BEARDSLEY LLP
1221 Broadway, 21st Floor
Oakland, California 94612
Telephone: (510) 451-3300
Facsimile: (510) 451-1527
Email: rwhite@fablaw.com;
dnewton@fablaw.com; spasquinelli@fablaw.com

Attorneys for Plaintiff YottaMark, Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| YOTTAMARK, INC., a California corporation,<br><br>Plaintiff,<br><br>vs.<br><br>TRACEGAINS, INC., a Colorado corporation, and BRADLEY LONG, an individual,<br><br>Defendants. | Case No.: C09-03055<br><br>**COMPLAINT FOR MISAPPROPRIATION OF TRADE SECRETS, COPYRIGHT INFRINGEMENT, ACCOUNTING, CONSPIRACY, AND BREACH OF CONTRACT**<br><br>DEMAND FOR JURY TRIAL |

Plaintiff YottaMark, Inc. alleges:

1. **Jurisdiction.** This court has diversity jurisdiction of this action under 28 U.S.C. § 1332 because:

   a. Plaintiff YottaMark, Inc. ("YottaMark" or "Plaintiff") is a corporation organized under the laws of the State of Delaware, qualified to do business in the State of California, and having its principal place of business in Redwood City, California;

   b. Defendant TraceGains, Inc. ("TraceGains") is a corporation incorporated under the laws of the State of Delaware, qualified to do business in the State of Colorado, and having its principal place of business in the Longmont, Colorado;

1
COMPLAINT FOR MISAPPROPRIATION OF TRADE SECRETS, COPYRIGHT INFRINGEMENT,
ACCOUNTING, CONSPIRACY, AND BREACH OF CONTRACT

        c.     Defendant Bradley Long ("Long") is an individual and citizen of Matthews, North Carolina;

        d.     There is complete diversity of citizenship between the Plaintiff and Defendants; and

        e.     The amount in controversy exceeds $75,000.00, exclusive of interest and costs.

2. This court has personal jurisdiction over Defendant TraceGains because TraceGains employs sales representatives that market and sell its products within California. Plaintiff is informed and believes and thereon alleges that Defendant TraceGains employs a Vice President of Sales for the Western Region who maintains a presence in the San Francisco Bay Area. Therefore, TraceGains has purposefully availed itself of the privilege of conducting activities in California.

3. This court also has personal jurisdiction over Defendant Long because as part of his employment with Plaintiff, Long received and executed a "Nondisclosure Agreement." Paragraph 16 of the Nondisclosure Agreement states that "[t]his Agreement shall be governed by the laws of the State of California, without reference to conflict of laws principles." During the course of his employment by YottaMark, Long regularly traveled to California and attended sales meetings at Plaintiff's offices at which many of the proprietary information and trade secrets at issue in this suit were disclosed to him. By execution of the Nondisclosure Agreement and his business trips to California, Long has purposefully availed himself of the privilege of conducting activities in California.

4. In addition, because this action arises under the copyright laws of the United States, this court has subject matter jurisdiction pursuant to the provisions of 28 U.S.C. § 1331, 1338, and the provisions of 15 U.S.C. § 1121.

5. This court has supplemental jurisdiction over this matter pursuant to 28 U.S.C. § 1367(a) as to the additional claims of misappropriation of trade secrets, conspiracy, and breach

of contract that are related to foregoing claims in the action within the court's original jurisdiction, since they form part of the same case or controversy under Article III of the United States Constitution.

6. **Venue.** Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(b) and (c) because a substantial part of the events giving rise to the claims occurred in this district.

7. Plaintiff demands a jury trial. Fed. R. Civ. Pro. § 38(b); Federal CRC 3-6.

8. Plaintiff is informed and believes and thereon alleges that Defendants TraceGains and Long, and each of them, are responsible in some manner for the events and happenings herein referred to, and caused injuries and damages proximately thereby to Plaintiff as alleged herein.

9. **Intradistrict Assignment.** Local Rule 3-2(c) allows for a district wide assignment for intellectual property actions. Plaintiff requests that the case be assigned to either the Oakland or San Francisco divisions of this Court.

10. **General Allegations.** YottaMark specializes in product traceability and authentication solutions. Leading companies in the fresh foods, electronics and consumer goods industries rely on YottaMark's robust traceability platform to conduct precise trace back, enhance communication, and increase security in their supply chain. YottaMark has developed proprietary solutions to a wide range of traceability and authentication challenges.

11. Since 2007, YottaMark has used the federally registered trademark HarvestMark® ("HarvestMark") in connection with its food and agriculture tracing solutions. The goal of tracing in the food industry is to allow companies, consumers, and investigators to rapidly identify the source of a product and/or the path it took through the supply chain. The central goal is to make food recalls narrower and faster because of heightened and immediate accuracy of information. If the source of contaminated product can be isolated quickly, then

1  unaffected products can be sold again, and consumers can have confidence that the products
2  they are buying are safe.

3      12.    While many farms, distributors, and retailers have programs that trace produce
4  within their own operations, few have established programs that allow access to trace data
5  outside their enterprise and few engage in standardized trace labeling. YottaMark is one of
6  several companies that specialize in providing a solution that allows produce to be traced from
7  the harvest or packing event to the consumer, with information on its path along that route.

8      13.    HarvestMark is the industry's fastest growing produce traceability application. It
9  incorporates a system of software that generates unique, encrypted codes which can be affixed
10 to every package or item sold to a retailer, distributor, or consumer, and which associates those
11 codes with information about the product, together with report generation capabilities and
12 analytic tools enabling growers, shippers, packing houses, distributors and retailers to examine
13 production volumes, consumer feedback, quality issues and other matters. The encrypted codes
14 can be scanned throughout a product's journey from farm to consumer, and the resulting
15 information can be accessed by entering the product code at the HarvestMark website or at
16 specific customer websites.

17     14.    YottaMark has distinguished itself as a pioneer in the industry when compared to
18 its competitors. YottaMark's business is characterized by the high cost of customer acquisition
19 followed by a long term, annuity based revenue stream. Selling to customers in this industry is
20 time consuming and expensive, with a typical timeline of 9 to 18 months from first contact with
21 a prospective customer to closing a sale.

22     15.    Because there are currently no mandatory food safety standards that require
23 farm-to-fork traceability, not every food producer is willing to invest the time or money into
24 adopting a trace program. Therefore, YottaMark expends significant effort in explaining the
25 benefits of a customer's adoption of its services and working with potential customers to

4

COMPLAINT FOR MISAPPROPRIATION OF TRADE SECRETS, COPYRIGHT INFRINGEMENT,
ACCOUNTING, CONSPIRACY, AND BREACH OF CONTRACT

7/7/09 (26177) #340622.1

understand and meet their unique needs before it can close a sale. Thereafter, however, YottaMark's customer retention is extremely high.

16. YottaMark has invested millions of dollars building a deep understanding of the structure of the produce industry, its membership, and the connectivity between members. This includes non-disclosure agreements and confidentiality provisions with employees, partners, advisors and customers.

17. **The GTIN Assignment Tool.** One of several proprietary items which Defendants Long and TraceGains misappropriated from YottaMark is YottaMark's proprietary GTIN Assignment Tool.

18. There is no federal or state imposed requirement for produce manufacturers to be able to trace their goods from harvest to distributor, retailer, restaurant or end consumer. However, factors including widespread food recalls wreaking havoc on food distribution prompted some of the most influential industry groups in North America to form the Produce Traceability Initiative ("PTI") which, in October 2008, launched an action plan setting forth voluntary standards for all produce brands shipping within or shipping into North America to meet.

19. The PTI proposed that every produce shipper, processor and repacker (hereafter "brand owners") be assigned a unique number, called a GS1-issued company prefix ("Company Prefix"). Under the PTI standards, every brand owner will be required to give every case-level SKU (stock keeping unit, such as each case of apples or bin of watermelons) they pack a unique number, and append this to their GS1-issued company prefix. The resulting combination is a unique 14 digit number called a Global Trade Item Number, or GTIN. The GTIN has several other attributes, including a packaging level prefix (which indicates whether it is an item, case or some other type of container), and a checksum suffix (which is an algorithm that ensures that the barcode reader correctly reads the code).

20. Only one organization, GS1, can issue Company Prefixes. Each brand owner, however, is required to compile their own GTIN assignments, and ensure they comply with the industry standards. GS1 provides an online tool, called Data Driver, which was designed for generic consumer packaged goods to assist brand owners in assigning GTINs.

21. There are several unique and inconspicuous anomalies of the produce industry that make Data Driver awkward for brand owners to use to create their GTINs. In response to this problem, YottaMark began to work on a produce-specific GTIN assignment mechanism in February 2009, with the goal of using such a mechanism to distinguish YottaMark and give it a competitive advantage in the marketplace.

22. Between February 2009 and June 2009, YottaMark researched the PTI guidelines and best practices, studied the Data Driver tool, and interviewed authors of the new standard, together with industry experts and brand owners who were YottaMark customers and prospective customers. After substantial trial and error, over a period of five months, a YottaMark employee with a PhD in engineering from Cambridge University completed the HarvestMark GTIN Assignment Tool ("GTIN Assignment Tool").

23. The GTIN Assignment Tool was created in Microsoft Excel. There were two final versions developed: one in which the line items could be entered in directly, and one that included a macro and drop down menus to help build the GTINs.

24. The GTIN Assignment Tool included several unique features that represented substantial progress beyond Data Driver and which solved flaws in Data Driver, including, but not limited to:

    a. Automatic calculation of number of items;

    b. User prompts to enter all the necessary attributes required to create a unique GTIN;

    c. Automatic detection of duplicated GTINs;

    d. Automatic calculation of correct checksums;

6
COMPLAINT FOR MISAPPROPRIATION OF TRADE SECRETS, COPYRIGHT INFRINGEMENT, ACCOUNTING, CONSPIRACY, AND BREACH OF CONTRACT
7/7/09 (26177) #340622.1

      e.   Automatic generation of both case and item-level GTINs;

      f.   Logic allowing multiple packing configurations for identical items; and

      g.   Logic permitting automatic completion of GTIN templates for retail customers.

25. The GTIN Assignment Tool version with macros included additional unique features including drop down menus, and nested menus, to define commodities, varieties, country of origin, and buttons to create and delete individual GTINs and logic to prevent duplicate GTIN creation.

26. **Other Proprietary Information.** Plaintiff also maintained other proprietary and trade secret information, including, but not limited to, compilations of data regarding its customers and prospects, including names and contact information for actual decision makers at each company, traceability needs and interests, summaries of reactions and comments in response to review of particular products, and scheduled future contact; confidential contract language and terms; and confidential business plans. This information relates to both Plaintiff's HarvestMark (agriculture) solutions and its YottaMark (consumer goods) solutions in the traceability industry, and derives independent economic value from not being generally known to persons outside Plaintiff's employ.

27. This proprietary information is maintained in strict confidence by Plaintiff. Computer access is password protected and limited to employees only. All employees are subject to confidentiality and non-disclosure agreements with Plaintiff. Plaintiff's employee handbook also specifies the importance of maintaining confidentiality in several places. Information is carefully controlled and sensitive information is distributed only to those employees who need access to it, and typically identified in writing as information that cannot be distributed outside of the company. Employees with access to confidential information, such as the sales staff, attend periodic meetings at which confidentiality is discussed.

28. This proprietary information derived both actual and potential independent

economic value from not being generally known to the public or to other persons who could obtain economic value from its disclosure, including TraceGains and other competitors in the traceability industry.

### FIRST CLAIM
Misappropriation of Trade Secrets
(Against All Defendants)

29. Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 28 of the Complaint with the same force and effect as if fully set forth at length herein.

30. On or about August 28, 2006, Defendant Long accepted a position with YottaMark, as Director of Business Development.

31. In the course of his work at YottaMark, Defendant Long had access to all of YottaMark's confidential and proprietary information and trade secrets, including, but not limited to, its GTIN Assignment Tool; customer lists; customer preferences; price lists; partner agreements; and information regarding which customers/prospective customers were ready to purchase Plaintiff's products.

32. On March 31, 2009, YottaMark's Chief Marketing Officer, Dr. Elliott Grant, the author of the GTIN Assignment Tool, sent draft copies of the GTIN Assignment Tool to YottaMark's Sales Team, including Long. The Sales Team was being shown the GTIN Assignment Tool for marketing and demonstration purposes only and was given explicit instructions by Dr. Grant: "Do not distribute this tool outside the company." That email was accompanied by the company's Confidentiality Footer. True and correct copies of Dr. Grant's email and copy of the GTIN Assignment Tool (v2.0) are attached hereto as Exhibits A and B, respectively, incorporated herein by reference.

33. On or about April 2, 2009, Dr. Grant refined the tool, creating GTIN Assignment Tool v4.0, which was distributed to the sales team on April 2, 2009. Dr. Grant again shared the tool with YottaMark's sales force, as an attachment to an email which specified that the tool was

"not for distribution." That email was also accompanied by the YottaMark confidentiality footer. True and correct copies of Dr. Grant's email and copy of the GTIN Assignment Tool v4.0 are attached hereto as Exhibits C and D, respectively, and incorporated herein by reference.

34. On or about April 2, 2009, YottaMark notified Long that his compensation package was being realigned.

35. On or about June 3, 2009, YottaMark reorganized its Sales Division and eliminated Defendant Long's position. Long was notified this same day that his position had been eliminated and his access to the YottaMark email system, Virtual Private Network, and Salesforce database was terminated immediately. Plaintiff informed Long that he was required to return all of Plaintiff's proprietary information as soon as possible.

36. Throughout the period from April 2, 2009 through June 3, 2009, YottaMark's Sales Team, including Defendant Long, marketed the GTIN Assignment Tool to its current and prospective customers, using it as evidence of YottaMark's substantial innovation and superior system. At the time Defendant Long was laid off, there were multiple contract proposals being negotiated with current and prospective customers, many of which had been initiated over a year earlier, and which involved substantial time, effort and expense by YottaMark.

37. During a Webinar on May 28, 2009, YottaMark specifically identified its GTIN Assignment Tool as a unique feature of the HarvestMark offering. A TraceGains employee attended this Webinar without disclosing their identity, and, on information and belief, recognized the tool's competitive value in the marketplace.

38. Defendant TraceGains is a direct competitor of YottaMark.

39. YottaMark is informed and believes and thereon alleges that starting in mid-June 2009, Defendant Long became employed as the Senior Director of Business Development for TraceGains.

40. On or about June 17, 2009, YottaMark became concerned that Defendants Long and TraceGains were using or planning to use YottaMark's confidential information and trade

9
COMPLAINT FOR MISAPPROPRIATION OF TRADE SECRETS, COPYRIGHT INFRINGEMENT, ACCOUNTING, CONSPIRACY, AND BREACH OF CONTRACT
7/7/09 (26177) #340622.1

secrets, including, but not limited to, its GTIN Assignment Tool; customer lists; customer preferences; price lists; partner agreements; and information regarding which customers or prospective customers were ready to purchase YottaMark's products.

41. On June 17, 2009, Plaintiff's attorney sent cease and desist letters to Defendants TraceGains and Long informing and reminding them of the Agreement that Long signed while employed with YottaMark. Plaintiff also requested that Long return all of its confidential information still in his possession, including, but not limited to: a laptop computer, YottaMark and HarvestMark product price lists, paper and electronic copies of customer agreements, proposals and quotes, copies of YottaMark and HarvestMark template contracts including Customer License Agreements, Reseller Agreements, and Table License Agreements, customer specific presentations, YottaMark and HarvestMark product presentations, sales and business collateral, product samples, materials from YottaMark customers including label stock, packaging containers, customer and prospect lists and affiliated contract information, and YottaMark employee information, including contact information. True and correct copies of the cease and desist letters are attached hereto as Exhibit E and incorporated herein by reference.

42. On June 18, 2009, a YottaMark employee participated in a Webinar marketing presentation to prospective customers, in which TraceGains was a presenter. The Webinar included screenshots of TraceGains's new GTIN Management Module. A true and correct copy of the product presented as TraceGains's new GTIN Management Module is attached hereto as Exhibit F and incorporated herein by reference. TraceGains's new GTIN Management Module is virtually identical to the YottaMark GTIN Assignment Tool in the following respects:

   a. It has an identical SKU Count Algorithm. The algorithm that takes the company prefix and determines how many individual items can be assigned is identical, including the placement on the page and heavy border;

   b. The Error Check Algorithm has been renamed "Management," but is identical in every way, including color, placement and border;

    c.  It has identical wording. YottaMark used particular wording that was unique to the algorithm embedded in the tool, specifically, the user is asked to enter the Item Number as text, as the leading zeroes need to be preserved. The wording "Enter Item Number (as text)" is identical;

    d.  The column headings and order Commodity, Variety, Origin, Grade, Size and Growing Method are identical. These are listed in arbitrary order in the HarvestMark tool; and

    e.  The column arrangement, borders, placement, and user interface design is identical.

43.   TraceGains made some minor cosmetic changes to disguise the GTIN Management Module's provenance, including:

    a.  removal of Plaintiff's HarvestMark logo and replacement with TraceGains's logo;

    b.  changing of colors of columns; and

    c.  rearrangement of the company data entry box.

44.   During the June 18, 2009 Webinar, Defendant TraceGains took credit for the development of the GTIN Assignment Tool, by claiming that, "We've created a simple tool to help create your GTIN, calculate your check sum digits and manage that on a go forward basis." Plaintiff is informed and believes and thereon alleges that prior to Defendant Long's commencement as an employee at Defendant TraceGains, Defendant TraceGains did not have GTIN assignment capabilities remotely comparable to Plaintiff's GTIN Assignment Tool.

45.   YottaMark monitors the competitive environment carefully, through press, trade shows, websites, seminars and Webinars. In addition, it tracks all known competitors to understand their competitive positioning. At no time prior to the TraceGains discovery on June 18, 2009, had YottaMark seen any type of GTIN assignment tool, which had taken it five months to create, used by any competitor (other than the GS1-produced tool, Data Driver).

46. On or about June 19, 2009, Long notified Bill Hoover, YottaMark's Vice President of Finance and Operations, that he shipped all of Plaintiff's equipment, including its laptop to his attention, after several requests by Plaintiff.

47. On June 22, 2009, Plaintiff received its laptop computer that Long had retained. The records on the laptop computer returned to YottaMark by Defendant Long show that Long spent the two weeks after he was terminated by YottaMark reviewing proprietary files including customer lists, customer pricing structures, and the GTIN Assignment Tool, and downloading documents to an external hard drive. The records show that Long removed the HarvestMark logo and the copyright legend from the GTIN Assignment Tool and provided it to TraceGains. The records show that TraceGains executives asked Long to provide the GTIN Assignment Tool by email.

48. On June 29, 2009, YottaMark then hired a forensic computer expert to examine Long's laptop. The consultant found that between Long's termination on June 3, 2009, when he was instructed to return all YottaMark assets including his company-issued laptop, and June 19, 2009, when he ultimately returned the laptop, someone using Long's computer accessed YottaMark internal documents on the laptop including customer contracts for many of YottaMark's existing customers (including customers that Long never worked with), lead lists generated at trade shows and other events attended by YottaMark, saved a version of YottaMark's GTIN Assignment Tool with the copyright legend and the HarvestMark logo stripped out of it, accessed and modified files containing TraceGains' name, and exchanged dozens of emails with TraceGains' Vice President of Global Operations, Glenn Smith and TraceGains' Vice President of Sales, Robert Hudson.

49. The consultant further discovered that on June 18, 2009 (during a relatively short period of time), someone using Long's computer (with a USB device plugged in) accessed a total of over sixty YottaMark internal documents containing confidential information, including lead lists and many of its customer contracts (even ones that Long never worked on), and its

12
COMPLAINT FOR MISAPPROPRIATION OF TRADE SECRETS, COPYRIGHT INFRINGEMENT, ACCOUNTING, CONSPIRACY, AND BREACH OF CONTRACT
7/7/09 (26177) #340622.1

GTIN Assignment Tool. The consultant concluded that the accessing of these files in rapid succession at a time when the USB device was attached was consistent with the computer having copied the files from the laptop to the USB drive.

50. The consultant also determined that on June 18, 2009, someone using Long's computer (and logged into Long's Gmail account) visited a series of websites (allexperts.com, whitecanyon.com, and secure delete) and searched for "delete documents from computer". Evidence on the computer is consistent with someone having used some kind of permanent deletion software to delete some files, as there are links to TraceGains related files in the My Documents folder on the laptop, but forensic tools were unable to recover the files referenced.

51. The HarvestMark GTIN Assignment Tool represents months of intensive research, coordination with trade groups, and investment of resources by YottaMark and is most valuable between now and September 30, 2009. The other proprietary information misappropriated by Defendants represents years of YottaMark's investment in establishing itself in the traceability industry, including internal information about YottaMark's most valuable customer relationships.

52. The information misappropriated by Defendants was not known to Defendant TraceGains and is valuable to it. Defendants' use of this information harms YottaMark.

53. YottaMark differentiates itself in the market from companies such as TraceGains by developing innovative tools that make the prospect or customer's job easier. By misappropriating this tool and positioning it as their own, TraceGains is directly and materially affecting YottaMark's hard won position as the thought leader and innovator.

54. Plaintiff is informed and believes, and thereon alleges that Defendants have wrongfully used and are continuing their wrongful use of Plaintiff's confidential information, trade secrets, and information protected by copyright, including, but not limited to, its GTIN Assignment Tool, customer lists, customer preferences, price lists, partner agreements, and

information regarding which customers or prospective customers were ready to purchase Plaintiff's products.

55. In addition to monetary damages, Plaintiff has suffered irreparable and non-quantifiable injury to its customer relations, reputation, and goodwill.

56. At all times herein alleged Plaintiff acted reasonably to protect and maintain the confidential nature of its proprietary information, including, but not limited to, its GTIN Assignment Tool, customer lists, customer preferences, price lists, and information regarding which customers or prospective customers were ready to purchase Plaintiff's products.

57. TraceGains accepted Plaintiffs' trade secrets from Long, with full knowledge that what they were accepting were trade secrets belonging to Plaintiff. Moreover, TraceGains used said trade secrets of Plaintiff, including, but not limited to, its GTIN Assignment Tool, and falsely advertised it as TraceGains' own creation.

58. The aforementioned acts of misappropriation of Plaintiff's trade secrets by Defendants Long and TraceGains constitute violations of both California common law and the Uniform Trade Secrets Act, Civil Code Section 3426 et al.

59. As a direct and proximate result of said misappropriation of trade secrets, Plaintiff has suffered damages in an amount to be proven at trial.

60. Plaintiff is also entitled to a temporary, preliminary and permanent prohibitory and mandatory injunction to enjoin Defendants Long and TraceGains from any future use of Plaintiff's trade secrets, confidential information, and information protected by copyright including, but not limited to, its GTIN Assignment Tool, customer lists, customer preferences, price lists, partner agreements, information regarding which customers or prospective customers were ready to purchase Plaintiff's products from all regions in which is sells its products.

61. At all times herein mentioned, the Defendants, and each of them, were the agents, servants, and employees of each of the other Defendants, as well as the agents of all Defendants, and at all times herein mentioned were acting within the scope of said agency and employment.

62. At all times herein mentioned, Defendants, and each of them were members of, and engaged in, a joint venture and common enterprise and acted within the course and scope in pursuance of said joint venture and enterprise.

63. At all times herein mentioned, the acts and omission of the various defendants, and each of them, concurred and contributed to the various acts and omissions of each and all of the other defendants in proximately causing the injuries and damages as herein alleged.

64. Defendants, and each of them, ratified each and every act or omission complained of herein.

WHEREFORE, Plaintiff prays for judgment as hereinafter set forth.

## SECOND CLAIM
Copyright Infringement
(Against All Defendants)

65. Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 28 of the Complaint with the same force and effect as if fully set forth at length herein.

66. Prior to April 2, 2009, Plaintiff created and wrote an original spreadsheet tool entitled GTIN Assignment Tool.

67. This tool was written using Microsoft Excel, which Plaintiff does not claim as its original work, but also contains a large amount of material wholly original with Plaintiff and is copyrightable subject matter under the laws of the United States.

68. Since April 2, 2009, the tool has been published by Plaintiff in strict conformity with all laws governing copyright.

69. Since April 2, 2009, Plaintiff has been and still is the sole proprietor of all rights, title and interest in and to the copyright in the tool.

70. After June 3, 2009, Defendants infringed the copyright by publishing and representing a tool entitled GTIN Management Module as part of its traceability services for customers, which was copied largely from Plaintiff's copyrighted tool entitled GTIN

Assignment Tool. A copy of each document is attached hereto as Exhibits B and D, respectively.

71. After June 3, 2009, and continuously since about June 18, 2009, Defendants have been publishing, selling and otherwise marketing the tool entitled GTIN Management Module.

72. Plaintiff is informed and believes and thereon alleges that Defendant Long gave the GTIN Assignment Tool to TraceGains.

73. By the conduct described in this complaint, the Defendants have been engaging in unfair trade practices and unfair competition against Plaintiff to Plaintiff's irreparable damage. Defendants are using and presenting the GTIN Assignment Tool as their own, for their own profit, pecuniary gain and advancement, and Defendants are deriving and will continue to derive revenue and acclaim from this violation of Plaintiff's rights.

74. Although the Defendants had full knowledge that YottaMark's work was protected by copyright laws of the United States, they willfully infringed the copyright when by blatantly and substantially copying YottaMark's work, and publishing, distributing and selling the infringing material in the United States and perhaps internationally. As a result, Defendants should be liable to YottaMark for punitive damages.

WHEREFORE, Plaintiff prays for judgment as hereinafter set forth.

### THIRD CLAIM
Accounting
(Against All Defendants)

75. Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 28 and 66 through 74 of the Complaint with the same force and effect as if fully set forth at length herein.

76. As a consequence of Defendants' infringement of Plaintiff's copyrighted GTIN Assignment Tool, YottaMark is entitled to an accounting from Defendants for all gains, profits and advantages derived by Defendants from their publication, license, distribution, and sale of the infringing GTIN Management Module.

77. Based on this accounting, Defendants should pay over to YottaMark statutory damages and all sums derived by way of profit from the publication, license, distribution, sale or other disposal of the infringing material.

WHEREFORE, Plaintiff prays for judgment as hereinafter set forth.

## FOURTH CLAIM
Conspiracy
(Against All Defendants)

78. Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 77 of the Complaint with the same force and effect as if fully set forth at length herein.

79. Defendants Long and TraceGains, between and amongst themselves, had knowledge of and agreed to misappropriate trade secrets belonging to Plaintiff for their own benefit and to Plaintiff's detriment.

80. Defendants Long and TraceGains, as part of their objective and conduct, offered, accepted, and used Plaintiff's trade secrets, including, but not limited to, its GTIN Assignment Tool; customer lists; customer preferences; price lists; partner agreements; information regarding which customers/prospective customers were ready to purchase Plaintiff's products from all regions in which is sells its products.

81. Defendants Long and TraceGains, as part of their objective and conduct, used Plaintiff's trade secrets to solicit Plaintiff's customers away from Plaintiff.

82. As a direct and proximate result of said conspiracy, Plaintiff has suffered damages in an amount to be proven at trial.

83. Plaintiff is also entitled to a temporary, preliminary and permanent prohibitory and mandatory injunction to enjoin Defendants Long and TraceGains from any future use of Plaintiff's trade secrets, confidential information, and information protected by copyright including, but not limited to, its GTIN Assignment Tool; customer lists; customer preferences;

1 price lists; information regarding which customers/prospective customers were ready to
2 purchase Plaintiff's products from all regions in which is sells its products.

3  WHEREFORE, Plaintiff prays for judgment as hereinafter set forth.

### FIFTH CLAIM
Breach of Contract
(Against Defendant Long)

84. Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 83 of the Complaint with the same force and effect as if fully set forth at length herein.

85. As part of his employment with Plaintiff, Long received and executed a "Nondisclosure Agreement" ("NDA Agreement"). A true and correct copy of the NDA Agreement is attached hereto as Exhibit G and incorporated herein by reference.

86. As a condition of his employment with Plaintiff, Long executed an offer letter ("Offer Letter") which provided that his employment was contingent upon his execution of a Proprietary Information Agreement which prohibits the use or disclosure of Plaintiff's proprietary information and that the Proprietary Information Agreement ("PIA") formed the binding terms of his employment. A true and correct copy of the Offer Letter is attached hereto as Exhibit H and incorporated herein by reference.

87. The PIA explicitly prohibits the disclosure of proprietary and confidential information. A true and correct copy of the PIA is attached hereto as Exhibit I and incorporated herein by reference.

88. As part of his employment with Plaintiff, Long also received an Employee Handbook ("Employee Handbook"). True and correct copies of relevant portions of the Employee Handbook are attached as Exhibit J and incorporated herein by reference.

89. At all times since Long signed said Agreements and accepted the Employee Handbook, Plaintiff has performed all of the conditions of the Agreement that were to be performed on its part and complied with all terms of the Employee Handbook.

18
COMPLAINT FOR MISAPPROPRIATION OF TRADE SECRETS, COPYRIGHT INFRINGEMENT, ACCOUNTING, CONSPIRACY, AND BREACH OF CONTRACT
7/7/09 (26177) #340622.1

90. By said Agreement and Employee Handbook, Long agreed that he would not at any time, without consent of Plaintiff, disclose or use for his own benefit or to the business disadvantage of Plaintiff any proprietary information of Plaintiff, except as necessary in the course of his employment with Plaintiff.

91. In the course and scope of his employment, Long also provided and negotiated the customer contract terms and non-disclosure agreements which included strict agreements to confidentiality, including obligations of YottaMark not to disclose information regarding customers or prospects outside of YottaMark. Long was fully aware of these agreements, which YottaMark has with each of its customers and with numerous prospects.

92. Long, without Plaintiff's permission, knowledge or consent, materially breached said NDA Agreement, Offer Letter conditions, PIA, employee handbook, and agreements between YottaMark and its customers and prospects by taking and using Plaintiff's proprietary information, including, but not limited to, its GTIN Assignment Tool, customer lists and other confidential customer information, to his own advantage and to the business disadvantage of Plaintiff by, among other things, offering said proprietary information and using said proprietary information on behalf of Plaintiff's competitors.

93. As a direct and proximate result of said wrongful breach of the Agreements, Plaintiff has suffered damages in an amount to be proven at trial.

94. Plaintiff is also entitled to a temporary, preliminary and permanent prohibitory and mandatory injunction to enjoin any future use of Plaintiff's trade secrets, confidential information, and information protected by copyright including, but not limited to, its GTIN Assignment Tool, customer lists, customer preferences, price lists, partner agreements, information regarding which customers or prospective customers were ready to purchase Plaintiff's products from all regions in which is sells its products.

**PRAYER**

WHEREFORE, Plaintiff prays for judgment as follows:

1. For temporary, preliminary and permanent prohibitory and mandatory injunctive relief to enjoin Defendants Long and TraceGains from any future use of Plaintiff's trade secrets, confidential information, and information protected by copyright including, but not limited to, its GTIN Assignment Tool, customer lists, price lists; partner agreements; information regarding which customers or prospective customers were ready to purchase Plaintiff's products from all regions in which is sells its products, and for return of all such information and materials in their possession or control;

2. For general damages in an amount unknown at the present time, all according to the proof to be presented at trial;

3. For consequential damages in an amount unknown at the present time, all according to the proof to be presented at trial;

4. For punitive and exemplary damages;

5. For an accounting of profits derived by Defendants from the publication, license, distribution, sale or other disposal of the infringing material, and a judgment for the damages disclosed by the accounting, including:

   a. Damages provided by statute for Defendants' statutory copyright infringement; and

   b. All monies determined to be profits generated or arising from the infringing material;

6, For costs of suits, including reasonable attorneys' fees pursuant to Cal. Civil Code § 3426.4 and 17 U.S.C. § 505;

7. For such other and further relief as the Court may deem proper.

Dated: July 7, 2009

FITZGERALD ABBOTT & BEARDSLEY LLP

By _____
Richard T. White
Attorneys for Plaintiff YottaMark, Inc.